## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA
## AT OKLAHOMA CITY

| | | |
|---|---|---|
| 1. Pharmacy Corporation of America, | § § § | |
| *Plaintiff*, | § | Case No. _____ |
| | § | |
| *v.* | § § | |
| 1. Barney Kent Abbott a/k/a Kent Abbott, Individually and as Co-Trustee of the Abbott Family Trust | § § § § | |
| Serve: 210 Lavaca Street, Apt. 2712, Austin, TX 78701 | § § § § | |
| 2. Jalee Abbott, Individually and as Co-Trustee of the Abbott Family Trust | § § § | |
| Serve: 210 Lavaca Street, Apt. 2712, Austin, TX 78701 | § § § § | |
| 3. Cody Abbott, Serve: 531 N. Blake Ave. Hydro, OK 73048; | § § § § | |
| 4. Abbott Family, LLC, Serve: Len Carson, Registered Agent 201 Robert S Kerr Ave. Suite 1600, Oklahoma City, OK 73102 | § § § § § § § § | |
| 5. Rodney Nixon, Serve: 13200 SW 5th Street, | § § | |

Yukon, OK 73099 §
§
6. Keith Propps §
Serve: 100502 N. 2460 Road §
Weatherford, OK §
73096 §
§
7. Pharmacy Care USA of Weslaco, §
LLC, §
Serve: Kent Abbott, §
Registered Agent §
2260 South IH-35, §
Suite 201 §
San Marcos, TX 78666 §
§
8. Advanced Pharmacy Services, §
LLC §
Serve: Daniel E. Jens, §
Registered Agent §
237 S. 7th Street §
Grand Junction, CO §
81501 §
§
9. Pharmcare of Durant, Inc. §
Serve: Rod Nixon, §
Registered Agent §
510 N. Arapaho Avenue §
Hydro, OK 73048 §
§
10. Pharmacy Care USA of §
Addison, LLC §
Serve: Tim Von Dohlen, §
Registered Agent §
600 Congress Avenue, §
Suite 300 §
Austin, TX 78701 §
§

11. Pharmacy Care USA of San
Marcos, LLC
  Serve: Kent Abbott,
     Registered Agent
     2260 South IH-35
     Suite 201
     San Marcos, TX 78666

12. PharmcareOK Enid, Inc.
  Serve: Rod Nixon,
     Registered Agent
     510 N. Arapaho Avenue
     Hydro, OK 73048

13. PharmcareOK of Hydro, OK,
Inc.
  Serve: Rod Nixon,
     Registered Agent
     510 N. Arapaho Avenue
     Hydro, OK 73048

14. PharmcareOK of Tulsa, Inc.
  Serve: Rod Nixon,
     Registered Agent
     510 N. Arapaho Avenue
     Hydro, OK 73048

15. PharmcareOK, Inc.
  Serve: Rod Nixon,
     Registered Agent
     510 N. Arapaho Avenue
     Hydro, OK 73048

16. PharmcareUSA of Edison, Inc.
  Serve: Employee Services USA,
     Inc., Registered Agent
     95 Newfield Avenue

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Suite A        §
Edison, NJ 08837    §
                     §

17. Pharmcare USA of Florida LLC  §
    Serve: Registered Agent  §
         Solutions, Inc.,  §
         Registered Agent  §
         2894 Remington Green  §
         Lane, Suite A  §
         Tallahassee, FL 32308  §
                     §

18. PharmcareUSA of Greater  §
Phoenix, LLC  §
    Serve: Capitol Corporate  §
         Services Inc.,  §
         Registered Agent  §
         8825 N. 23rd Ave.,  §
         Suite 100  §
         Phoenix, AZ 85021  §
                     §

19. PharmcareUSA of Houston,  §
LLC  §
    Serve: Pharmacy Care USA of  §
         Addison, LLC,  §
          Registered Agent  §
         4500 Ratliff Lane,  §
          Suite 102  §
         Addison, TX 75001  §
                     §

20. PharmcareUSA of Lubbock,  §
LLC  §
    Serve: Pharmacy Care USA of  §
         Addison, LLC,  §
         Registered Agent  §
         4500 Ratliff Lane,  §
          Suite 102  §
         Addison, TX 75001  §

21. SOTX Enterprises, LLC        §
    Serve:  Rodney Nixon,        §
           Registered Agent        §
           510 Arapaho Avenue        §
           Hydro, OK 73048        §
                      §
      *Defendants.*        §
                      §
                      §

## COMPLAINT

Plaintiff, Pharmacy Corporation of America ("PharMerica"), for its Complaint against defendants Barney Kent Abbott a/k/a Kent Abbott, Jalee Abbott, Cody Abbott, Abbott Family, LLC, Rodney Nixon, and Keith Propps (together, Propps, Nixon, Kent, Jalee, Cody, and Abbott Family, LLC are the "RICO Defendants"),[1] Pharmacy Care USA of Weslaco, LLC ("Weslaco"), Advanced Pharmacy Services, LLC ("APS"), Pharmcare of Durant, Inc. ("Durant"), Pharmacy Care USA of Addison, LLC ("Addison"), Pharmacy Care USA of San Marcos, LLC ("San Marcos"), PharmcareOK Enid, Inc. ("Enid"), PharmcareOK of Hydro, OK, Inc. ("Hydro"), PharmcareOK of Tulsa, Inc. ("Tulsa"), PharmcareOK, Inc. ("Oklahoma"), PharmcareUSA of Edison, Inc. ("Edison"), PharmcareUSA of Florida LLC ("Florida"),

---

[1] Because there are three individual defendants with the last name "Abbott," PharMerica will refer to each by their first name throughout this Complaint.

PharmcareUSA of Greater Phoenix, LLC ("Phoenix"), PharmcareUSA of Houston, LLC ("Houston"), PharmcareUSA of Lubbock, LLC ("Lubbock"), SOTX Enterprises, LLC ("SOTX," and together with Weslaco, APS, Durant, Addison, San Marcos, Enid, Hydro, Tulsa, Oklahoma, Edison, Florida, Phoenix, Houston, and Lubbock, the "Fraudulent Transfer Defendants"), states as follows.

## NATURE OF THE ACTION

1.      Kent, Jalee, Cody, Mr. Nixon, and Mr. Propps are corporate officers of Pharmcare USA ("Pharmcare"). Abbott Family, LLC is a legal person which owns Pharmcare and its entities. Abbott Family, LLC is owned entirely by the Abbott Family Trust, of which Kent and Jalee serve as Co-Trustees. Together, Kent, Jalee, Cody, Mr. Nixon, Mr. Propps, and Abbott Family, LLC are the "RICO Defendants." This action arises from the RICO Defendants' unlawful association-in-fact and conspiracy to operate Pharmcare through a pattern of racketeering activity.

2.      At first glance, Pharmcare—a family-owned venture—appears to provide long-term care pharmacy services to post-acute, assisted living, and other long-term care communities throughout the United States. But more lurks beneath the surface. The RICO Defendants operate an association-in-fact, the "Abbott Family Enterprise," which serves two purposes: (1) exploit their access to the Pharmcare venture to embezzle Medicare and other healthcare benefit funds for their own use—

funds that Pharmcare's fragile population of residents receive to pay for the care and treatment they need; and (2) conceal their fraudulent scheme by any means necessary. The Abbott Family Enterprise accomplishes the first objective via their dominance and control over Pharmcare entities; it accomplishes the second through deceit and obstruction.

3.     PharMerica was harmed by the Abbott Family Enterprise's racketeering, as it was the proper recipient of the healthcare benefit funds the RICO Defendants embezzled. Pharmcare entities have suffered, too.

4.     Weslaco owes PharMerica the principal amount of $1,474,282.66 pursuant to a judgment entered by this Court, which judgment affirmed a binding arbitration award that Weslaco failed to challenge.

5.     PharMerica commenced the arbitration proceeding after Weslaco failed to immediately remit to PharMerica monies received from Medicare and other insurance payors but owed to PharMerica following PharMerica's purchase of that pharmacy from Weslaco.

6.     After the Arbitrator issued the award in favor of PharMerica, Weslaco did not pay it, so PharMerica commenced an action in this Court to confirm the arbitration award.

7.    Rather than respond to the complaint, RICO Defendants caused Weslaco to file a fraudulent bankruptcy proceeding to avoid the debt and force a stay in the confirmation action and, thus, indefinitely delay any collection and post-judgment discovery efforts PharMerica would likely undertake to uncover the depths of the fraud.

8.    That bankruptcy proceeding was dismissed "for cause pursuant to 11 U.S.C. § 707(a),"[2] and judgment was subsequently entered for PharMerica against Weslaco on the award.[3]

9.    Thereafter, PharMerica commenced post-judgment discovery, which revealed that the RICO Defendants illegally diverted those Medicare and other healthcare benefits funds from Weslaco to various Pharmcare and Pharmcare-affiliated entities via multiple acts of wire, mail, and healthcare fraud. RICO Defendants concealed its pattern of racketeering activity via (1) bankruptcy fraud (in an attempt to thwart PharMerica's collection and hide its illegal behavior, but it only stalled litigation in the confirmation action, delayed post-judgment discovery, and demonstrated once again the steps the RICO Defendants would take to hide their illegal behavior) and (2) obstruction (both by concealing documents before and

---

[2] *See In re Pharmacy Care USA of Weslaco, LLC*, No. 23-13025 (Bankr. W.D. Okla.) at Doc. No. 28.
[3] *See Pharmacy Corporation of America v. Pharmacy Care USA of Weslaco, LLC*, No. 5:23-CV-00971 (W.D. Okla.) at Doc. No. 20.

during the arbitration and causing a fraudulent bankruptcy proceeding to be filed to obstruct the confirmation action).

10.     Given the magnitude of RICO Defendants' illegal conduct, this action asserts claims against them under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and, in the alternative, Oklahoma state law. Specifically, RICO Defendants conducted the Abbott Family Enterprise's affairs through a pattern of racketeering activity—namely, healthcare fraud, mail fraud, wire fraud, bankruptcy fraud, and obstruction—and, thus, impermissibly enriched themselves to the detriment of PharMerica, which this Court has confirmed is owed over $1.4 million.

## THE PARTIES

11.     PharMerica is a California corporation with its principal place of business in Louisville, Kentucky. Thus, for diversity purposes, PharMerica is a citizen of California and Kentucky. PharMerica provides institutional pharmaceutical services to various facilities nationwide.

12.     Kent, a citizen of Oklahoma, is the President and Chief Executive Officer of Pharmcare. In his capacity as an officer of Pharmcare, Kent exerts direct control over all Pharmcare entities. Indeed, Kent is identified as President, Director, or Manager of every Pharmcare and Pharmcare-affiliated entity that PharMerica is

aware of. Moreover, Kent is Co-Trustee and Beneficiary of the Abbott Family Trust, which is the sole member of Abbott Family, LLC. Abbott Family, LLC is the majority, if not sole, member of all Pharmcare and Pharmcare-affiliated entities (*i.e.*, sole or majority member in the case of an LLC, and sole or majority shareholder in the case of a corporation), including the Fraudulent Transfer Defendants.

13.    Jalee, a citizen of Oklahoma, is the Vice President, Treasurer, Director, and Secretary of Deer Creek Pharmacy Services, Inc. ("Deer Creek"), as well as a Co-Trustee and Beneficiary of the Abbott Family Trust. Jalee played a direct role in furthering the racketeering activity detailed in this Complaint, particularly through her direct, personal contribution of funds to Weslaco. Moreover, Deer Creek and Pharmcare are one and the same. According to Deer Creek's website, Deer Creek "founded" Pharmcare "in 1993 to help provide the surrounding area with quality pharmacy and medication management services."[4] Deer Creek's portfolio of nursing and rehabilitation facilities includes Western Health Management, Inc. d/b/a Maple Lawn Nursing & Rehabilitation, Binger Nursing and Rehabilitation, LLC d/b/a Binger Nursing and Rehabilitation Center, and Checotah Nursing and Rehabilitation, LLC d/b/a Checotah Nursing & Rehabilitation Center—all facilities that "contract" with Pharmcare. Moreover, Deer Creek's website lists "Pharmcare

---

[4] https://deercreekhealthcare.com/about/

Usa" as part of its "Network" and, most notably, even identifies "chowe@**pharmcarecorp.com**" as the email to use to contact Deer Creek.[5] Also, Deer Creek's registered agent is in fact Weslaco. And Kent is Deer's Creek's President and Director. Finally, Pharmcare's corporate office—located at 510 Arapaho Ave., Hydro, OK 73048—is within "The Deer Creek Building.":



14.     Cody, a citizen of Oklahoma, is "Director of Clinical Services" for Pharmcare and "Consultant Pharmacist" for Deer Creek. Specifically, Cody controls Pharmcare entities within the Oklahoma, Arizona, and New Mexico regions. These entities include, among others, defendants Phoenix; Durant; Enid; Hydro; Tulsa; and Oklahoma. Collectively, these facilities alone commingled $1,072,020.88 into Weslaco in furtherance of the racketeering activity that forms the basis of this Complaint. Cody thus played a direct role in furthering the racketeering activity

---

[5] *Id.*

detailed in this Complaint, particularly through his causing funds to be transferred from the Pharmcare-entities in his control to Weslaco.

15. Abbott Family, LLC is an Oklahoma limited-liability company. Its sole member is the Abbott Family Trust. Kent and Jalee are Co-Trustees and Beneficiaries of the Abbott Family Trust. Therefore, for diversity purposes, Abbott Family, LLC is a citizen of Oklahoma. In Texas, Abbott Family, LLC's registered agent is Weslaco. Interestingly, Pharmcare sold the assets of that entity to PharMerica, which sale forms the background of this action. Abbott Family, LLC's control of Pharmcare does not end there: It is directly involved in Pharmcare's business affairs. Indeed, even the City of Durant, Oklahoma recognized as much in its Annual Financial Report for FY 2021:[6]

The following schedule shows the current year activity related to these notes receivable:

| | Beginning Balance | Additions | Deletions | Ending Balance |
|---|---|---|---|---|
| DIA: | | | | |
| Cardinal FG Company | 92,359 | - | 20,000 | 72,359 |
| Abbott Family LLC/Pharmcare | 148,822 | - | 50,832 | 97,990 |
| Eagle Suspension | 143,316 | - | 19,998 | 123,318 |
| Earth Biofuels | 283,417 | - | - | 283,417 |
| Earth Biofuels-Allowance | (283,417) | - | - | (283,417) |
| Bruce Packing Company dba BrucePac | 700,000 | - | - | 700,000 |
| Total | $ 1,084,497 | $ - | $ 90,830 | $ 993,667 |

[6] https://www.sai.ok.gov/olps/uploads/durant_city_offinal_audit_report__2021_with_sa_43l3.pdf.

Additionally, it was Abbott Family, LLC—not some other Pharmcare shell—that in 2020 directly contracted with Manasota Commercial Construction to construct the Pharmcare USA – Medical Distribution Center in Palmetto, Florida for $1,161,630:[7]



16.     Mr. Nixon, a citizen of Oklahoma, is General Counsel of Pharmcare. In that capacity, Mr. Nixon serves as legal counsel for all Pharmcare entities, as well as the registered agent for most—but not all—Pharmcare and Pharmcare-affiliated entities. Mr. Nixon played a direct role in furthering the racketeering activity detailed in this Complaint, particularly through his efforts to frustrate the arbitration between Weslaco and PharMerica and to conceal the Abbott Family Enterprise's racketeering activity.

---

[7] https://www.manasotaconstruction.com/project/pharmcare-medical-distribution-center/.

17.     Mr. Propps, a citizen of Oklahoma, is the Chief Financial Officer of Pharmcare. Specifically, Mr. Propps has served as CFO since August 2019 and served as Assistant CFO between November 2017 to August 2019. Mr. Propps played a direct role in furthering the racketeering activity detailed in this Complaint, particularly through his efforts to frustrate the arbitration between Weslaco and PharMerica and to conceal the Abbott Family Enterprise's racketeering activity.

18.     Weslaco is a Texas limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Weslaco is a citizen of Oklahoma.

19.     APS is a Colorado limited-liability company. Its member(s) are citizens of Oklahoma and/or Colorado. Thus, for diversity purposes, APS is a citizen of Oklahoma and/or Colorado.

20.     Durant is an Oklahoma corporation with its principal place of business in Oklahoma. Thus, for diversity purposes, it is a citizen of Oklahoma.

21.     Addison is a Texas limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Weslaco is a citizen of Oklahoma.

22.     San Marcos is a Texas limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Weslaco is a citizen of Oklahoma.

23.     Enid is an Oklahoma corporation with its principal place of business in Oklahoma. Thus, for diversity purposes, it is a citizen of Oklahoma.

24.     Hydro is an Oklahoma corporation with its principal place of business in Oklahoma. Thus, for diversity purposes, it is a citizen of Oklahoma.

25.     Tulsa is an Oklahoma corporation with its principal place of business in Oklahoma. Thus, for diversity purposes, it is a citizen of Oklahoma.

26.     Oklahoma is an Oklahoma corporation with its principal place of business in Oklahoma. Thus, for diversity purposes, Oklahoma is a citizen of Oklahoma.

27.     Edison is a New Jersey corporation with its principal place of business in New Jersey. Thus, for diversity purposes, Edison is a citizen of New Jersey.

28.     Florida is a Florida limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Florida is a citizen of Oklahoma.

29.     Phoenix is an Arizona limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Phoenix is a citizen of Oklahoma.

30.     Houston is a Texas limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Houston is a citizen of Oklahoma.

31.     Lubbock is a Texas limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, Lubbock is a citizen of Oklahoma.

32.     SOTX is an Oklahoma limited-liability company. Its member(s) are citizens of Oklahoma. Thus, for diversity purposes, SOTX is a citizen of Oklahoma.

## JURISDICTION AND VENUE

33.     This court has original subject-matter jurisdiction over PharMerica's claims under 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over PharMerica's state law claims, which are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

34.     This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different states—PharMerica is a citizen of California and Kentucky, and no defendant is a citizen of either California or Kentucky—and the amount in controversy exceeds $75,000, exclusive of interest and costs.

35.     This Court has personal jurisdiction over Defendants because they have transacted business and/or provided services in this District and this action arises from those acts.

36.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this action occurred in this District.

**STATEMENT OF FACTS**

37.     Kent, Jalee, Cody, Mr. Nixon, and Mr. Propps are the principals of and control a business venture that acts under the name "Pharmcare." Pharmcare conducts legitimate business in the institutional pharmacy markets, as well as in the skilled-nursing and rehabilitation markets. The Pharmcare venture is composed of dozens of business associations throughout the country, both limited-liability companies and corporations, including Weslaco and Fraudulent Transfer Defendants.

38.     In late 2016, Kent, Jalee, Cody, Abbott Family, LLC, Mr. Nixon, and Mr. Propps also associated with one another to form the "Abbott Family Enterprise."

39.     The Abbott Family Enterprise, comprised of RICO Defendants and others known and unknown, functioned as an ongoing association for the shared and common purpose of achieving its illegal objectives, which objectives are discussed below. In seeking to achieve its objectives, the Abbott Family Enterprise engaged in a pattern of illegal activities, described below, which was conducted through and affected interstate commerce.

40.     Beginning in late 2016 and through today, RICO Defendants, acting through the Abbott Family Enterprise, exploited their control over Pharmcare and its various entities for the purpose of embezzling hundreds of thousands of dollars from PharMerica to the detriment of Pharmcare entities like Weslaco and the other Fraudulent Transfer Defendants.

41.     Throughout the existence of the Abbott Family Enterprise, and in furtherance of the Abbott Family Enterprise, RICO Defendants regularly caused communications to be sent interstate through the mail and wires to be made across state lines in furtherance of their scheme to embezzle PharMerica of healthcare benefit funds to which it was entitled.

42.     The purpose of the Abbott Family Enterprise was to embezzle healthcare benefit funds earmarked for PharMerica by any means necessary. It was a further goal of the Abbott Family Enterprise that RICO Defendants would conceal the scheme from detection through various means, including but not limited to: making materially false statements to PharMerica and to an Arbitrator; attempting to conceal critical evidence from discovery during a binding arbitration; and filing a fraudulent bankruptcy proceeding to thwart or hamper PharMerica's efforts to confirm its binding arbitration award—a disgusting abuse of the court system to achieve the illicit goals of the Abbott Family Enterprise.

43.     But while a purpose of RICO Defendants' scheme and the Abbott Family Enterprise was to defraud PharMerica and thereby enrich themselves, PharMerica is not the only victim of the scheme. Indeed, to accomplish its goals, upon draining Weslaco's bank account of all healthcare benefit funds, RICO Defendants would cause other Pharmcare-related entities to infuse a smaller sum of money back into Weslaco's account for one purpose: to pay PharMerica a reduced amount. Thus, Pharmcare itself suffered at the hands of the Abbott Family Enterprise.

44.     RICO Defendants each played important roles within the Abbott Family Enterprise in directing the conduct, operations, and management of the Abbott Family Enterprise. Kent's, Jalee's, and Abbott Family LLC's duties in the Abbott Family Enterprise included causing Weslaco to wire healthcare benefit funds to other Pharmcare entities, rather than PharMerica, upon receipt and to thereafter coordinate the wiring of funds from other Pharmcare entities back to PharMerica for the purpose of paying PharMerica a significantly reduced sum. Cody's duties in the Abbott Family Enterprise included causing Pharmcare entities under his control— those in Oklahoma, Arizona, and New Mexico—to wire funds to Weslaco for the purpose of paying PharMerica a significantly reduced sum. Mr. Nixon's, Mr. Propps's, and Kent's duties in the Abbott Family Enterprise included actively concealing the racketeering activities of the Abbott Family Enterprise by any means

necessary—including obstructing a binding arbitration proceeding and causing a fraudulent bankruptcy proceeding to be filed for the purpose of thwarting or staying an action to confirm the underlying arbitration award.

45. Beginning in late 2016 and continuing to this day, the Abbott Family Enterprise has engaged in dozens, and on information and belief, hundreds, of acts of racketeering activity, including mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), theft or embezzlement in connection with healthcare (18 U.S.C. § 669), bankruptcy fraud (18 U.S.C. § 157), and obstruction (18 U.S.C. § 1512(c)), which actions are summarized and described more fully below. The racketeering acts committed by the Abbott Family Enterprise were coordinated, regular, continuous, interrelated, and ongoing, as summarized and detailed below.

46. The Abbott Family Enterprise has engaged in activities which affect interstate commerce for the purposes of 18 U.S.C. § 1962(c). In particular, the Abbott Family Enterprise was engaged in and affected interstate commerce because RICO Defendants conspired with one another to embezzle healthcare benefit funds received from various payors—including Medicare—to avoid their payment to PharMerica, a California corporation headquartered in Kentucky. All this conduct and relevant background are detailed below.

## PharMerica Buys Weslaco's Assets

47.     In 2016, pursuant to an Asset Purchase Agreement ("APA"), PharMerica purchased the assets of two institutional pharmacies, one of which, Weslaco, was part of the Pharmcare venture.

48.     The purchase price was $9.588 million, which PharMerica paid and Weslaco accepted.

49.     The APA excluded accounts receivable ("AR") as of the Closing Date. In other words, Weslaco kept its AR for certain payors and customers, and PharMerica would be entitled to payments received after September 30, 2016 (or the Closing Date).

50.     But PharMerica could not submit bills for the goods and services it provided post-closing of the APA because Weslaco held certain licenses, permits, and other approvals required to operate the businesses and bill applicable third-party payors, such as Medicare, Medicaid, and private pay. And, because approval of licensing, regulatory, and other factors took time, PharMerica could not immediately switch the pharmacies over to its full control. Instead, a transition period was necessary while all the required approvals were obtained. This is an ordinary occurrence in the healthcare industry.

51. Accordingly, PharMerica and Weslaco entered into a Transition Services Agreement ("TSA") to facilitate transition of the pharmacy services from Weslaco to PharMerica.[8] Schedule B to the TSA sets forth the services Weslaco would provide to PharMerica and the fees PharMerica would pay to Weslaco for those services.

52. Among the services Weslaco provided under the TSA, and for which PharMerica paid in full, was billing and collection for goods and services PharMerica provided and monies owed to PharMerica from its post-closing operation of the pharmacies for up to six months thereafter until PharMerica obtained necessary licenses and approvals to bill directly.

53. Due to the nature of health care reimbursement, these goods and services were not paid by Medicare, Medicare Part D Plans, and other third-party payors until several weeks or even months after their provision.

54. Thus, during the transition period, not only was Weslaco collecting payments for goods and services it had provided pre-closing, but it was also collecting payments, including Medicare payments, for goods and services PharMerica provided post-closing. As to the latter, the TSA required Weslaco to "immediately forward and remit to" PharMerica "any payments received … with respect to such claims."

---

[8] The TSA is not attached as an exhibit to this Complaint because it contains commercially sensitive information.

**RICO Defendants Embezzle Medicare and Other Healthcare Benefit Funds**

55.     As it turns out, Weslaco did not honor its obligation "to immediately forward and remit to" PharMerica "any payments received" under the TSA and, thus, the APA. Specifically, Weslaco underpaid PharMerica the amounts it was owed by hundreds of thousands of dollars and drug it out for years under the pretense it was reconciling the receipts.

56.     But Weslaco did not act voluntarily: RICO Defendants compelled Weslaco to breach the TSA and APA and thus misappropriate funds, including Medicare funds, that belonged to PharMerica for post-closing goods and services.

57.     Specifically, RICO Defendants embezzled the funds by systematically draining Weslaco's bank account immediately upon receipt of a healthcare benefit payment (whether made by Medicare, a private payor, or an individual). The later findings of an Arbitrator support the same: "virtually all of the funds" Weslaco "collected from payors from the Bank of Hydro Weslaco account" were withdrawn such that the "ending bank balance on April 30, 2018 was $551.37." In other words, rather than "immediately forward and remit" the payments collected by Weslaco to PharMerica as required by the TSA, RICO Defendants caused Pharmcare and Pharmcare-related entities to "**withdr[a]w the funds for [their] own use**." Consequently, "**[v]arious Pharmcare entities received the funds transferred**

**out of the bank even though millions of dollars in payments were still due to PharMerica.**" This is illegal.

58. Federal law (18 U.S.C. § 669) provides:

> Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds . . . or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both . . .

59. The term "health care benefit program" includes the funds stolen by RICO Defendants in this action that should have been "immediately forward[ed] and remit[ted] to" PharMerica.

60. To throw PharMerica off their scent, RICO Defendants caused "various Pharmcare entities" to "deposit[], wire[], and transfer[] funds back into" Weslaco's "Bank of Hydro account." RICO Defendants would then cause Weslaco to trickle payments to PharMerica from these funds which, to be clear, were less than the funds Weslaco received from Medicare, third-party payors, and individual payors.

61. Notably, Kent and Jalee personally provided funds to Weslaco for this purpose:

 

62. Although PharMerica was at the time unaware—and indeed had no way to become aware—of RICO Defendants' fraudulent scheme, PharMerica nonetheless suspected that it was being underpaid. So, it questioned Kent and Mr. Nixon regarding Weslaco's underpayments and sought documentation of Weslaco's work to evidence what Weslaco had been paid by the different payor sources. Kent and Mr. Nixon refused to provide such information. Repeatedly.

63. Eventually, enough was enough. In September 2019, PharMerica retained outside counsel for this matter. PharMerica's counsel promptly advised Kent of the same, via letter dated September 17, 2019, transmitted by email.

64. On September 25, 2019, Kent responded to the letter and acknowledged that Pharmcare owed PharMerica "additional monies," which he said "may be roughly $800,000 at this point."

65. In that letter, Kent further advised that he was "***personally*** auditing the billing and collection records and remitting to PharMerica any amounts owed,"

and that he would conclude the audit "somewhere around May 2020" when "all amounts Pharmcare owes to PharMerica will have been paid." Kent also represented—without prompting—that he denied any "intent to convert PharMerica's funds."

66. However, an Arbitrator later determined that it did "not believe that Pharmcare's claims regarding the amount of time needed to audit their billing and collection records [were] credible." Indeed, "Pharmcare collected their very last payment in April 2018, so it is difficult to comprehend how their audit of their own records could take until May 2020, much less why they didn't make their last payment to PharMerica until October 2020."

67. And, as it turns out, "the vast majority of payments collected after November 2016 were for post-Closing services (*i.e.*, fill dates after September 30, 2016), which meant the funds belong[ed] to PharMerica." Mr. Nixon, on Weslaco's behalf, conceded *in writing* during the arbitration that "Pharmcare was to pass along to PharMerica money that was already PharMerica's money. It was never Pharmcare's money." So the RICO Defendants knew they were stealing (and defrauding Medicare) and, worse, intended to do so.

68. What's more, as later discovered by the Arbitrator, Kent and Mr. Nixon caused Weslaco to charge PharMerica—via offset of the amounts to be immediately

remitted to PharMerica per the TSA—$22,500 per month for TSA Accounting Fees for five months *after* the TSA's Termination Date. The supposed justification for these billings?: "working with PharMerica employees on accounting issues in December 2017 and February 2018 . . . with no explanation as to what they were working on or why it justified taking an offset for the full amount of the TSA fee for five additional months."

## PharMerica and Pharmcare Agree to Binding Arbitration[9]

69.     Section 3.10(b) of the TSA required the parties to arbitrate any controversy or claim arising out of or relating to it or any related agreement or any of the transactions contemplated in it.

70.     However, rather than submit to an ordinary arbitration as contemplated by the TSA, Mr. Nixon proposed, via written correspondence dated October 20, 2020, "that a mutually agreed upon, independent, third party forensic accountant [should] examine" Weslaco's "books." "Whatever amount, if any, that the accountant finds that we failed to pass on to PharMerica, **we will pay that amount**."

71.     PharMerica relied on Mr. Nixon's representations and thus agreed to submit its dispute to a forensic accountant to act as the arbitrator.

---

[9] To present a chronology of the events preceding this Complaint, PharMerica has already detailed certain findings of the arbitrator which concerned the period prior to the arbitration.

72. To that end, by agreement dated April 8, 2021, the parties amended and restated the arbitration agreement in Section 3.10(b) of the TSA, appointed Forvis (f/k/a "BKD")—a forensic accounting firm with experience in the healthcare industry—as "the Arbitrator," and established procedures and terms for the arbitration.

73. By agreement dated April 15, 2021, between the parties and Forvis (f/k/a "BKD"), H. Bryan Callahan, CPA/CFF, CVA, CFE was designated as "the lead service provider for this engagement," *i.e.*, the Arbitrator.

74. PharMerica and Weslaco were actively involved in the arbitration for over two years, providing documents, information, and briefing on the parties' dispute. The massive delay was due to Pharmcare's misrepresentations, obstruction, and failure to timely provide documents.

75. In the arbitration, the Arbitrator requested information from both parties, but "primarily needed records from" Weslaco "because" it had "provided the billing and collection services that were the basis for the Dispute."

76. Throughout the arbitration, the Arbitrator "encountered difficulties in receiving information and documentation from" Weslaco "in a timely manner." Additionally, much of the documentation the Arbitrator did receive from Weslaco

"was delayed or inadequate." In fact, the Arbitrator chronicled some of these deficiencies:

- For Insurance payments support, Pharmcare provided us with documents they referred to as "EOBs" but which were really system-generated "Claims Reconciled" documents. Pharmcare was unable to answer questions regarding the documents, including the source of the data or the system that generated the documents. They were also unable to provide the underlying 835 remittance advise ("835 remits") source documents which they would have received when they were doing the billing and collections under the TSA. The 835 remits include information on fill dates, which are critical to determining which funds they collected were theirs to retain and which were to be remitted to PharMerica. As will be discussed in the Insurance section of this report, we collected the 835 remits directly from Insurance payors, which was complicated by the amount of time that had elapsed since the records were originally provided to Pharmcare back in the 2016 through 2018 timeframe.

- For Facility payments support, Pharmcare provided us with a one-page worksheet with no underlying support. The worksheet was just a summary of what Pharmcare showed they invoiced each Facility, and what each Facility paid, in the six months after Closing. When we requested the underlying invoices (which would have the critical information on fill dates), Pharmcare's CFO [Mr. Propps] responded that he did not have access to the invoices and that they would be in the ComputerRx pharmacy system. As will be discussed in the Facility section of this report, Pharmcare later stated in a May 15, 2023 email that billing was being done out of their DRx-Omega pharmacy system rather than CompterRx, and in May and June of 2023 Pharmcare began providing us with the detailed invoices we had previously requested.

- For Individual payments support, Pharmcare provided us with various summary worksheets by month which we provided the name and account number of the individual and the amount of their payments that Pharmcare determined was owed to PharMerica. The worksheets did not include claims detail, such as fill dates. Additionally, the worksheets did not include 100% of the payments received by Pharmcare post-Closing; they only included the portion of each payment received that Pharmcare believed was due PharMerica.

77. Notably, Kent, Mr. Nixon, and Mr. Propps "did not provide" the Arbitrator with *any* documents supporting Weslaco's entitlement to *any* post-Closing funds—despite the Arbitrator's repeated insistence that they do so.

78. Worse still, the Arbitrator could not trace the payments reported on Weslaco's one-page worksheet or the payments deposited in its bank account with Bank of Hyrdo back to data in Weslaco's internal ComputerRx system. Notably, the "accounts for each Facility showed charges by month, but the payment fields were all blank. Instead of payment details, there were adjustments with the description 'Omega Billing Adj – EL.'"

79. The Arbitrator "questioned Pharmcare about these Omega adjusting entries on multiple occasions starting with an email dated January 4, 2023. Although Pharmcare responded to some of" the Arbitrator's "questions, it was not until March 26, 2023 that Pharmcare's CFO," Mr. Propps, "emailed stating, when they were converting ComputerRx to DRx (a dispensing module of Pharmcare's Omega system),

they were operating both pharmacy systems side by side. He said that at the end of the month, the biller would credit out whatever was in ComputerRx because they were invoicing from DRx. This was the first time Pharmcare mentioned the DRx system. Prior to that time, Pharmcare had maintained that they were using ComputerRx as their pharmacy software. In fact, in an email string with Pharmcare that started February 16, 2022," the Arbitrator "asked for support for Pharmcare's one-page Facility worksheet and specifically asked for the invoices. In a March 17, 2022 email," Mr. Propps—"the CFO of Pharmcare"—falsely represented when he "said he did not have access to them. He said the invoices were in CompterRx. Yet, one year later, Pharmcare indicated the invoicing was being done out of their own DRx-Omega system, which they did have access to."

80.     Perplexed, the Arbitrator "asked Pharmcare on what date the pharmacy started dispensing/invoicing from DRx-Omega and, on July 3, 2023, Mr. Propps responded that the date was August 2014. That was more than two years before the Closing, so it is unclear why" Kent, Mr. Nixon, or Mr. Propps "did not tell" the Arbitrator "from the beginning that the data" it "requested for" its "analysis was contained in Pharmcare's DRx-Omega system."

81. Notably, Mr. Nixon had told PharMerica the same thing on September 16, 2020, via written correspondence. When PharMerica's counsel asked Mr. Nixon to provide account history reports for each of the third-party payors so that PharMerica could reconcile the payments owed, Mr. Nixon represented that he could not do so because Weslaco no longer "had access to ComputerRX." Mr. Nixon added that "ComputerRx was the dispensing system back then," which "would have" been used "for billing/collection purposes." As the Arbitrator determined, this representation was a blatant lie.

82. The Arbitrator also detected misconduct concerning the handling of funds received by Individual payors. Specifically, "$10,050.83 in Individual payments identified in ComputerRx were not traceable to the Bank of Hydro and were not included in offsets taken by [Weslaco] for amounts deposited by PharMerica." Of that amount, it was determined that PharMerica received funds totaling $2,764.44—but not the remaining $7,286.39.

83. When asked by the Arbitrator if Weslaco received those funds, Mr. Propps had this to say: "If you do not see anything in our bank account then it is safe to say we did not receive it because we deposited everything in that one bank account. I can't see anything regarding those payments in our software either. Best I could tell is they wanted them cleared out of CRX so they cleared them without receiving

the payment. I have no idea why they would have done that unless they were considering we would never be paid on those because maybe they were past due or something."

84.     The Arbitrator did not find Mr. Propps's response convincing: "it appears unlikely that these amounts were cleared without receiving payment. Additionally, Mr. Propps previously explained that the initials at the end of the payment descriptions were those of Pharmcare employees who processed the payments. The same initials appear for these transactions as appeared on transactions that went through the Bank of Hydro. Finally," the Arbitrator was "able to trace many of these payments to amounts Pharmcare included on their own Individual worksheets as payable to PharMerica. It seems unlikely they would pay PharMerica for amounts they never collected."

85.     Despite Kent's, Mr. Nixon's, and Mr. Propps's antics, the Arbitrator managed "to obtain sufficient information"—including "information received from third party Insurance payors, Pharmcare's DRx/Omega system, the ComputerRx system, Bank of Hydro bank statements, check copies, public sources, and other information received from Pharmcare and PharMerica"—"to render a final conclusion and award." The Arbitrator's Dispute Resolution Report is attached as

**Exhibit 1**. It thus entered a final award in PharMerica's favor, broken down as follows:

(a) "PharMerica should have received $7,125,841.58 of the total funds Pharmcare collected from Insurance payors post-closing";

(b) "PharMerica should have received $1,904,822.44 of the total funds Pharmcare collected from Facilities post-Closing";

(c) "PharMerica should have received $20,780.87 of the total funds Pharmcare collected from Individuals";

(d) Offsets "of $52,474.03 should be allowed against the funds due PharMerica for Insurance, Facility, and Individual";

(e) "Pharmcare paid PharMerica $8,251,164.56 for Insurance, Facility, and Individual";

(f) "Pharmcare owes PharMerica $726,476.36 in interest on payments collected that were not paid, or not timely paid, to PharMerica per the TSA. Additionally, interest will continue to accrue at 6% per annum from the date" the report was "delivered until Pharmcare pays PharMerica the amount awarded."

86.    So, in sum, on August 11, 2023, the Arbitrator entered a final award in PharMerica's favor in the amount of $1,474.282.66, with post-judgment interest to

accrue at the rate of 6% until paid in full. As of August 11, 2025, the award plus interest totals $1,651,196.58. Interest continues to accrue at the daily amount of $242.35.

## Pharmcare Refuses to Honor the Arbitrator's Award

87.     Despite his earlier representation that "we will pay" whatever "amount" a forensic accountant determines Weslaco "failed to pass on to PharMerica", on September 12, 2024, in response to inquiry from PharMerica's counsel about payment of the award, Mr. Nixon advised, "We will not immediately pay the award."

88.     Mr. Nixon added, "Pharmacy Care USA of Weslaco, LLC, currently has total assets of approximately $80.00 in a bank account. As you are aware, PharMerica purchased all Pharmacy Care USA of Weslaco, LLC's assets, including inventory, equipment, and customers approximately seven years ago. Although still in good standing with the Texas Secretary of State, the company has been dormant for years. Due to the excessiveness of the award, we are examining the option of bankruptcy.

## PharMerica Seeks Confirmation of the Arbitration Award

89.     Considering Mr. Nixon's letter, on October 25, 2023, PharMerica filed an action in this Court against Weslaco styled *Pharmacy Corporation of America v.*

*Pharmacy Care USA of Weslaco, LLC*, (Case No. CIV-23-971-SLP) seeking confirmation of the arbitration award (the "Confirmation Action").

90.    The following morning, PharMerica's counsel emailed Mr. Nixon, Pharmcare's General Counsel, to see if he would accept service of the summons on Weslaco's behalf. That same day, Mr. Nixon agreed to accept service and, on October 27, 2025, PharMerica's counsel thanked Mr. Nixon for the same and provided him with a copy of the Petition, its exhibits, and the summons.

## RICO Defendants Cause Weslaco to File a Fraudulent Bankruptcy Action to Conceal their Racketeering Activity

91.    Rather than respond to PharMerica's Petition in the Confirmation Action, on November 14, 2023, Mr. Nixon directed outside counsel for Weslaco to file a Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the Western District of Oklahoma (Case No. 23-13025 SAH) (the "Bankruptcy Action").

92.    The filing of the Bankruptcy Action stayed the Confirmation Action.

93.    The bankruptcy ostensibly sought the discharge of PharMerica's debt. It was filed under the penalty of perjury by Kent and failed to identify all the amounts stolen as "Accounts Receivable" from related parties (RICO Defendants) but conveniently lists the totality of assets as $80.

94.    PharMerica was the only creditor, and its arbitration award was the only debt shown on the schedules and matrix to the petition in the Bankruptcy Action. In

essence, it sought to deliver the $80 in "assets" to PharMerica and wipe out the award.

95.     Notwithstanding Mr. Nixon's prior assertion that, "Pharmacy Care USA of Weslaco, LLC, currently has total assets of approximately $80.00 in a bank account," the Bankruptcy Action filings show that the attorney for Weslaco was paid $10,000 *three months earlier*, just *one day after* Mr. Nixon told PharMerica that Weslaco had only $80 in assets:



96.     The $10,000 check is signed by Kent. Notably, the check reveals that the funds were drawn from an account in the name of PHARMCAREUSA GENERAL— revealing comingling of funds.

97.     On January 9, 2024, PharMerica filed a motion to dismiss the Bankruptcy Action for cause on the grounds that it was filed in bad faith and

fraudulently. Weslaco opposed PharMerica's motion. Chief U.S. Bankruptcy Judge Sarah A. Hall heard PharMerica's motion on March 6, 2024.

98.     At the hearing, Judge Hall was perplexed as to why any debtor in Weslaco's shoes would petition for bankruptcy relief under these facts. So Judge Hall pointedly asked Weslaco's counsel—Reese Allen—to explain: "What in the heck is the purpose of this bankruptcy case? What's the purpose?" "It's the same purpose as in any bankruptcy case," Mr. Allen retorted.

99.     Understandably, that response did not assuage Judge Hall's concerns. After additional probing, Mr. Allen confessed to Judge Hall that "[t]he purpose of the bankruptcy case was to give us a chance to fight back . . . on the arbitration" and, thus, "to stop the arbitration from going forward."

100.    Judge Hall then pointed to the elephant in the room: If Weslaco is truly a defunct, non-operating entity as is claimed, then as a practical matter it should be unconcerned with the amount of the arbitration award, and any subsequent judgment confirming same, as it would be uncollectible in any event. So Judge Hall gave Mr. Allen another opportunity to answer her question: "We've had a defunct corporation for six years whose schedules reflect $80, one creditor, this creditor. What is the purpose? There's nothing to protect. This debtor is defunct and it has $80. What is this debtor trying to do? Telling me it's to simply stop the enforcement,

that's the worst use of $10,000, which is what it says you received, I've ever heard of if there's only $80 in this corporation. So you can tell me what's the purpose. 'Cause to protect $80 was not worth a $10,000 attorney fee, is it? Would you pay $10,000 to, to avoid a garnishment if you had $10 to your name? That's your only asset, no other assets. . . . What was the purpose of this bankruptcy case? It wasn't to protect $80."

101.    Mr. Allen's response? He's simply taking marching orders from the RICO Defendants: "You know, the client told me to file this bankruptcy," which he conceded was "a very simple" one. "Then why were you paid $10,000 for a simple bankruptcy," Judge Hall asked, obviously struck by Mr. Allen's concession. "Be, because it's going to be for more than a simple bankruptcy, I, I suspect. . . . Because they think they got run over by a dump truck," replied Mr. Allen.

102.    Unamused, and offering that the underlying purpose for the bankruptcy "could be" to "protect people who are behind the corporation," Judge Hall granted PharMerica's motion to dismiss the bankruptcy for cause from the bench. She detailed her findings on the record. Those findings included, among other things, (1) "I don't know what benefit bankruptcy has [here] other than imposing a stay on a creditor's attempt to enforce an arbitration award"; (2) "Courts view arbitration awards to be sacrosanct"; and (3) "your client by objecting to the dismissal of this case is basically thumbing its nose at favoring resolution of the dispute through

arbitration." A transcript of Judge Hall's March 6, 2024 hearing detailing her findings is attached as **Exhibit 2**.

103.   Two days later, on March 8, 2024, Judge Hall entered her Order granting PharMerica's motion to dismiss and thus dismissing Weslaco's Chapter 7 bankruptcy petition "for cause pursuant to 11 U.S.C. § 707(a)."

## This Court Confirms the Arbitrator's Award

104.   With the Bankruptcy Action dismissed, PharMerica was free to move this Court to reopen the Confirmation Action, which it did on March 19, 2024. PharMerica's Motion was granted the next day. This Court directed Weslaco to respond to PharMerica's complaint within 21 days.

105.   Twenty-one days came and went without Weslaco filing a responsive pleading to PharMerica's complaint. So, on April 17, 2024, PharMerica moved for entry of a default. Doc. No. 14. The Clerk of Court entered default the same day. Doc. No. 15.

106.   Subsequently, on May 3, 2024, PharMerica moved this Court for entry of a default judgment against Weslaco. Doc. No. 16. On June 18, 2024, this Court directed PharMerica to supplement its motion for entry of a default judgment to assuage its concerns regarding personal jurisdiction. Doc. No. 17. PharMerica promptly cured that deficiency, Doc. No. 19, as acknowledged by this Court in its

subsequent Order granting PharMerica's motion, Doc. No. 20: "Petitioner filed a timely supplement which thoroughly addressed the Court's concerns."

107. Thus, on July 9, 2024, this Court entered a Judgment for PharMerica and against Weslaco in the principal amount of $1,474,282.66; prejudgment interest through April 29, 2024 in the amount of $63,495.13, with *per diem* interest in the amount of $242.35 for each day thereafter until entry of judgment; post-judgment interest on the principal amount from the date of judgment accruing at the rate of 6% per annum; and PharMerica's costs in the action. A copy of this Court's Judgment is attached as **Exhibit 3**.

### Post-Judgment Discovery Finally Reveals the RICO Defendants' Racketeering Activity

108. Weslaco did not pay that Judgment and PharMerica's execution on the Judgment was unsuccessful. So PharMerica undertook post-judgment discovery.

109. On August 12, 2024, PharMerica served a third-party subpoena upon the Arbitrator seeking production of the "complete file . . . concerning the June 20, 2023 arbitration involving" PharMerica and Weslaco "in connection with the disputes arising from the Transition Services Agreement dated September 30, 2016." The Arbitrator was commanded to produce such documents by August 29, 2024 at 5:00 p.m.

110.   On August 28, 2024, the Arbitrator produced documents responsive to PharMerica's subpoena. These documents included Weslaco's bank statements, deposit details with copies of checks, and various summaries of the same.

111.   Upon review, PharMerica was shocked to discover that not only had Weslaco failed to pay PharMerica what it was owed—as the Arbitrator had determined—but also that the RICO Defendants had carefully orchestrated a fraudulent scheme by which they caused Weslaco and related Pharmcare entities to illegally divert the Medicare and other healthcare benefit funds originally owed to PharMerica to themselves, engaging in multiple acts of wire, mail, and healthcare fraud to do so.

112.   Although PharMerica first suspected that Weslaco was defunct after review of the Arbitrator's Dispute Resolution Report, which, as aforementioned, detailed Weslaco's practice of clearing out its Bank of Hydro account, at no time previously was it disclosed to PharMerica or otherwise indicated that Weslaco's actions were taken at the direction of the RICO Defendants for the RICO Defendants' benefit, or that Kent and Jalee personally contributed funds in furtherance of the fraudulent scheme.

113.   Thus, RICO Defendants fraudulently concealed from PharMerica that they directed Weslaco to transfer funds—*PharMerica's funds*—from Weslaco to

themselves or other Pharmcare entities they controlled—a fact that is indisputable in light of the unchallenged, final arbitration award.

114. Between 2016 and 2018, Weslaco received millions of dollars in compensation from various healthcare benefit payors for pharmacy goods and services provided by it and PharMerica to Weslaco's patients.

115. For example, between October 2016 and April 2018, Optum RX paid Weslaco $1,726,562.23 for pharmacy goods and services, most of which were provided by PharMerica. Between October 2016 and September 2017, Caremark paid Weslaco $4,177,477.93 for pharmacy goods and services, most of which were provided by PharMerica. Between October 2016 and March 2017, Argus Health paid Weslaco $413,805.36 for pharmacy goods and services, most of which were provided by PharMerica. And between October 2016 and March 2017, Catamaran paid Weslaco $528,131.90 for pharmacy goods and services, most of which were provided by PharMerica. Weslaco also received significant sums from Medicare and other individual payors for post-closing services provided by PharMerica to Weslaco's patients.

116. Weslaco was contractually obligated to "immediately remit" all such payments received for post-closing services to PharMerica. Weslaco, controlled by and at the direction of the RICO Defendants, did not do so.

117. Instead, the RICO Defendants caused Weslaco to transfer those funds to themselves or other entities they controlled.

118. And, thereafter, RICO Defendants caused the various Fraudulent Transfer Defendants to transfer their own funds to Weslaco so that payments could be made to PharMerica—thus throwing it off their scent.

119. Specifically, in furtherance of the Abbott Family Enterprise's fraudulent scheme, RICO Defendants caused:

    a. APS to transfer $140,241.08 to Weslaco;

    b. Durant to transfer $74,256.33 to Weslaco;

    c. Addison to transfer $241,860.31 to Weslaco;

    d. San Marcos to transfer $181,565.61 to Weslaco;

    e. Enid to transfer $39,889.01 to Weslaco;

    f. Hydro to transfer $24,414.57 to Weslaco;

    g. Tulsa to transfer $87,933.62 to Weslaco;

    h. Oklahoma to transfer $753,947.48 to Weslaco;

    i. Edison to transfer $72,171.75 to Weslaco;

    j. Florida to transfer $6,700 to Weslaco;

    k. Phoenix to transfer $91,579.87 to Weslaco;

    l. Houston to transfer $124,185.87 to Weslaco;

    m. Lubbock to transfer $6,700 to Weslaco;

    n. SOTX to transfer $45,000 to Weslaco; and

o. Kent and Jalee to transfer $50,000 to Weslaco.

120. All told, RICO Defendants caused $1,940,445.50 to be transferred from other Pharmcare entities (and, in one case, from Kent and Jalee's personal joint-checking account) to Weslaco in furtherance of the Abbott Family Enterprise's racketeering scheme.

121. A significant portion of this amount—$1,072,020.88—was transferred to Weslaco from entities that Cody oversaw—namely, Durant, Enid, Hydro, Tulsa, Oklahoma, and Phoenix.

122. In sum, the RICO Defendants "devised or intend[ed] to devise" a "scheme or artifice to defraud, or" to "obtain[] money . . . by means of false or fraudulent pretenses," through the use of "wire . . . communication in interstate . . . commerce"; thus, the RICO Defendants committed the offense of wire fraud in violation of 18 U.S.C. § 1343.

123. Further, the RICO Defendants "devised or intend[ed] to devise" a "scheme or artifice to defraud, or" to "obtain[] money . . . by means of false or fraudulent pretenses" through the use of the mail; thus, the RICO Defendants committed the offense of mail fraud in violation of 18 U.S.C. § 1341.

124. The RICO Defendants also "knowingly and willfully embezzle[d], st[ole], or otherwise without authority convert[ed] funds to the use of" persons other than

the rightful owner, PharMerica, and "intentionally misapplie[d]" funds of "health care benefit program[s]", Medicare and others, for their own enrichment. Thus, the RICO Defendants committed the offense of theft or embezzlement in connection with health care in violation of 18 U.S.C. § 669.

125. To conceal the same, the RICO Defendants "devised or intend[ed] to devise a scheme or artifice to defraud and[,] for the purpose of executing or concealing such a scheme or artifice or attempting to do so[,] file[d] a petition under Title 11" of the U.S. Code; "file[d] a document in a proceeding under Title 11;" and "made a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under Title 11"; thus, the RICO Defendants committed the offense of bankruptcy fraud in violation of 18 U.S.C. § 157.

126. And through their efforts to conceal their racketeering activity, RICO Defendants "corruptly . . . coneal[ed] record[s], document[s] or other object[s], or attempt[ed] to do so, with the intent to impair" its "availability for use in an official proceeding"; thus, the RICO Defendants committed the offense of obstruction. 18 U.S.C. § 1512(c).

# COUNT I
## Civil RICO
## 18 U.S.C. § 1961(c)
## (Against the RICO Defendants)

127.    PharMerica repeats and realleges the above allegations as if set forth here.

128.    By engaging in coordinated conduct toward a common purpose, the RICO Defendants established an association-in-fact enterprise—the Abbott Family Enterprise. Specifically, RICO Defendants worked together with two aims in mind: (1) to embezzle health care benefit funds received from Medicare other qualified healthcare programs by Weslaco on PharMerica's behalf and, thereafter, (2) conceal their scheme.

129.    RICO Defendants devised and implemented a scheme to defraud PharMerica by (1) systematically draining Weslaco—PharMerica's debtor—of all operating funds, namely, those received by healthcare benefit programs—of its financial resources to hinder its ability to immediately remit to PharMerica funds to which it was entitled; (2) paying PharMerica just enough money to keep PharMerica off of its scent and paradoxically increase the funds they could embezzle; (3) intentionally hiding financial records and other discovery during arbitration, as noted by the Arbitrator; (4), upon entry of a binding, final award in PharMerica's favor, refusing to pay the award, prompting PharMerica to seek confirmation of

same; (5) further draining Weslaco's funds in advance of fraudulently petitioning for bankruptcy protection—raising alarm bells for Judge Hall; and (6) filing the fraudulent bankruptcy petition to stay litigation—and thus discovery—in the Confirmation Action, to further conceal evidence of their fraudulent scheme.

130. The Abbott Family Enterprise continues to this day—namely, through efforts to conceal their racketeering activity and to further hinder PharMerica's collection efforts.

131. The activities of the Abbott Family Enterprise affected interstate commerce. RICO Defendants are each based in Oklahoma, Weslaco is based in Texas, PharMerica is based in Kentucky and California, and Fraudulent Transfer Defendants are based in Texas, Oklahoma, Colorado, New Jersey, Arizona, and Florida. Thus, the Parties each diverted resources across state lines. In RICO Defendants' respective cases, via interstate wire transfers to and from Weslaco and Fraudulent Transfer Defendants, as well as the defense of PharMerica's arbitration action and subsequent confirmation action; and in PharMerica's case, via its efforts to prosecute and collect upon PharMerica's arbitration award and judgment.

132. RICO Defendants conducted or participated in the management or operation of the Abbott Family Enterprise's affairs. Within their respective areas of responsibility, each directed the Abbott Family Enterprise's affairs, making

decisions on behalf of the Abbott Family Enterprise or knowingly carrying out decisions made by or with one or more other legal persons.

133. RICO Defendants each engaged in a pattern of racketeering activity in connection with their direction of the Abbott Family Enterprise's affairs. As alleged above, RICO Defendants engaged in at least two instances of mail fraud, multiple instances of wire fraud, multiple instances of theft or embezzlement in connection with healthcare, multiple instances of obstruction, and bankruptcy fraud—predicate acts of racketeering—within ten years of each other.

134. Each RICO Defendant engaged in the Abbott Family Enterprise knowing and expecting that it would be used to carry out a scheme to defraud PharMerica out of money and would use interstate mails and wire communications to do so. Specifically, the RICO Defendants, through the Abbott Family Enterprise, intentionally engaged in a scheme intended to deprive PharMerica of money through fraud, deceit, and artifice knowing that interstate mails and wires would be used to further the scheme. Each RICO Defendant knew and understood that at times each RICO Defendant would and did cause false statements to be made for purposes of executing the scheme. At other times, certain RICO Defendants' fraudulent conduct was so obvious to those within the Abbott Family Enterprise that other RICO Defendants must have been aware of it.

135.   For purposes of executing the scheme, RICO Defendants caused the use of interstate mails and wires hundreds of times in furtherance of the scheme, including but not limited to the specific examples discussed above. These mail and wire communications which often travelled across state lines were an essential part of the RICO Defendants' broader scheme which depended on the ability to communicate across state lines with Weslaco (based in Texas), PharMerica (based in California and Kentucky), and with other Pharmcare entities (scattered throughout Oklahoma, Colorado, New Jersey, Florida, New Mexico, Arizona, and Texas). As examples, RICO Defendants caused the interstate use of the mails and wires as part of their scheme to issue checks from Weslaco to the Fraudulent Transfer Defendants; from the Fraudulent Transfer Defendants to Weslaco; and from Weslaco to PharMerica. Further, RICO Defendants caused the interstate use of the mails and wires as part of their scheme to conceal their fraudulent scheme, including by making materially false statements on correspondence directed to PharMerica, its counsel, the arbitrator, and the U.S. Bankruptcy Court for the Western District of Oklahoma.

136.   In furtherance of their scheme, each RICO Defendant personally and repeatedly used or caused to be used the mails and wires. Each individual use of the mails and the wires caused by RICO Defendants in furtherance of the scheme is a separate RICO predicate act.

137.    Also, for purposes of executing the scheme, RICO Defendants "knowingly and willfully embezzle[d], st[ole], or otherwise without authority convert[ed]" to their own use "the moneys" or "funds" of several "health care benefit program[s]" earmarked for PharMerica. Thus, RICO Defendants committed the act of theft or embezzlement in connection with health care. 18 U.S.C. § 669.

138.    In furtherance of their scheme, each RICO Defendant personally and repeatedly embezzled, stole, or otherwise converted to the Abbott Family Enterprise's use such money or funds of several health care benefit programs earmarked for PharMerica. Each act in furtherance of same is a separate RICO predicate act.

139.    Additionally, for purposes of executing the scheme, RICO Defendants "devised . . . a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice" filed a bankruptcy petition; filed "a document in" the bankruptcy proceeding; and made "a false or fraudulent representation, claim, or promise concerning" its bankruptcy proceeding. 18 U.S.C. § 157.

140.    In furtherance of their scheme, at least Kent and Mr. Nixon—and upon information and belief, additional RICO Defendants—personally and repeatedly devised a scheme to conduct bankruptcy fraud and executed same. Each act in furtherance of same is a separate RICO predicate act.

141. Finally, for purposes of executing the scheme, RICO Defendants "corruptly" "conceal[ed] . . . record[s], document[s], [and/]or other objects, or attempt[ed] to do so, with the intent to impair those objects' . . . availability for use in" official proceedings—namely, a binding arbitration—and "otherwise obstruct[ed], influence[d], or impede[d]" an official proceeding—PharMerica's Confirmation Action by filing a fraudulent Bankruptcy Action to force a stay of all litigation. Thus, RICO Defendants committed the predicate acts of obstruction.

142. RICO Defendants' racketeering activity was continuous and related. RICO Defendants' racketeering acts were committed for the same common purpose: To further the unlawful objectives of the Abbott Family Enterprise. Defendants' racketeering acts were aimed at defrauding the same victim (PharMerica), were perpetrated by the same individuals (RICO Defendants), and were effectuated through common methods, as described above. For example, RICO Defendants routinely drained Weslaco's bank account of all health care benefit funds immediately upon receipt and, thereafter, caused a lesser amount of funds to be transferred to Weslaco for eventual payment of a reduced sum to PharMerica.

143. As set forth above, each RICO Defendant individually committed two or more racketeering acts in furtherance of the Abbott Family Enterprise. In addition to the individual acts set forth above, each RICO Defendant was aware that the

interstate mails and wires were regularly used to further the scheme. At the outset of the Abbott Family Enterprise, in late 2016, each RICO Defendant entered into an agreement with the one or more of the other RICO Defendants to further the objectives of the Abbott Family Enterprise knowing and expecting that one or more RICO Defendants would, and did, engage in a pattern of illegal racketeering activity in furtherance of the goals of the Abbott Family Enterprise.

144. PharMerica was directly and proximately financially harmed by RICO Defendants' scheme. As a direct result of their scheme, PharMerica was underpaid more than $700,000 of healthcare benefit funds and is owed roughly the same amount in interest—which amounts were determined by an Arbitrator and blessed with this Court's judicial confirmation via entry of a Final Judgment. Additionally, PharMerica incurred significant legal fees and costs prosecuting the arbitration, the Confirmation Action, opposing Weslaco's fraudulent Bankruptcy Action, plus the legal fees and costs it now incurs to prosecute the instant action.

**Count II**
**Civil RICO Conspiracy**
**18 U.S.C. § 1962(d)**
**(Against the RICO Defendants)**

145. PharMerica repeats and realleges the above allegations as if set forth here.

146.   Each RICO Defendant conspired with at least one other RICO Defendant to violate 18 U.S.C. § 1962(c). Specifically, each RICO Defendant agreed with at least one other RICO Defendant that, on behalf of the Abbott Family Enterprise, one or more RICO Defendants would drain Weslaco of money to defraud PharMerica, Medicare, and other qualified healthcare benefit programs, and thereafter provide funds to Weslaco as necessary to cover Weslaco's expenses and, in doing so, necessarily use the interstate mails and wires to further their respective scheme.

### COUNT III
### Common Law Fraud
### (Against Weslaco, Kent, and Mr. Nixon)

147.   Except to the that extent they are inconsistent with the relief sought in this Count, PharMerica repeats and realleges the above allegations as if set forth here.

148.   There are four elements of actionable common-law fraud: "(1) a false material misrepresentation, (2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, (3) with the intention that it be acted upon, and (4) which is relied on by the other party to his (or her) own detriment." *Bowman v. Presley*, 2009 OK 48, ¶ 13, 212 P.3d 1210.

149.   On September 25, 2019, via written correspondence, Kent—on behalf of Weslaco—represented to PharMerica that he was "personally auditing the billing and collection records" of Weslaco and was "remitting to PharMerica any amounts

owed." Kent further denied "any intent to convert PharMerica's funds" and indicated he would conclude his audit some eight months later—"around May 2020," at which point "all amounts" Weslaco "owes to PharMerica will have been paid."

150. Kent and Weslaco knew these statements to be false at the time they were made. Moreover, the statements were deemed to be material misrepresentations by the Arbitrator: the Arbitrator did "not believe that" the "claims regarding the amount of time needed to audit" Weslaco's "billing and collection records [were] credible." The Arbitrator continued: "it is difficult to comprehend how" Kent's "audit of" Weslaco's "records could take until May 2020, much less why they didn't make their last payment to PharMerica until October 2020."

151. Kent and Weslaco made these material misrepresentations with the intention that PharMerica rely upon them by delaying PharMerica's collection efforts, thus providing additional time for Kent and Weslaco to defraud PharMerica of its monies.

152. Regrettably, PharMerica relied on these material misrepresentations to its detriment. Indeed, PharMerica's reliance gave Kent and Weslaco the time needed to drain Weslaco of its funds and thus enrich Kent and other Pharmcare entities to PharMerica's detriment.

153. For his part, on October 20, 2020, via written correspondence, Mr. Nixon—on behalf of Weslaco—represented to PharMerica that he was "certain that we"—Kent and Mr. Nixon, on behalf of Weslaco—"have paid over all money that came into our possession that belong to PharMerica." Further, Mr. Nixon proposed "that a mutually agreed upon, independent, third party forensic accountant examine" Weslaco's "books." "Whatever amount, if any, that the accountant finds that we failed to pass on to PharMerica, **we will pay that amount**."

154. Additionally, on September 16, 2020, via written correspondence, Mr. Nixon—on behalf of Weslaco—represented to PharMerica that Weslaco could not print account history reports for each of the third-party payors because Weslaco no longer "had access to ComputerRX." Mr. Nixon added that "ComputerRx was the dispensing system back then," which "would have" been used "for billing/collection purposes."

155. Mr. Nixon and Weslaco knew these statements to be false at the time they were made. And their falsity can be demonstrated without a doubt.

156. As to the first material misrepresentation, on September 12, 2024, in response to inquiry from PharMerica's counsel about payment of the then-final arbitration award, Mr. Nixon—on behalf of Weslaco—advised, "**We will not immediately pay the award**." He then proceeded to cause Weslaco to file a

fraudulent bankruptcy proceeding to intentionally delay judicial confirmation of the underlying award.

157. The Arbitrator already found that the second representation was false: "[W]e were never able to get a satisfactory answer as to why" Weslaco "had directed us to ComputerRx for claims detail **when billing was being done out of DRx-Omega**," which Weslaco began using "more than two years before the Closing." And, after much pressing, Kent, Mr. Nixon, and Mr. Propps eventually caused "detailed invoices from DRx-Omega" to be produced to the Arbitrator in May 2023—invoices containing the very same information that PharMerica sought from Weslaco three years earlier.

158. Regrettably, PharMerica relied on Mr. Nixon's and Weslaco's material misrepresentations to its detriment. Indeed, PharMerica's reliance caused PharMerica to submit to arbitration by forensic examination rather than a traditional, binding arbitration—an opportunity Mr. Nixon and Weslaco seized to unduly delay the entry of a final decision by declining to produce documents as requested.

## COUNT IV
## Alter Ego/Veil Piercing
## (All Defendants)

159.    Except to the that extent they are inconsistent with the relief sought in this Count, PharMerica repeats and realleges the above allegations as if set forth here.

160.    Shareholders of a corporation and members of a limited-liability company may be held "personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." *Fanning v. Brown*, 2004 OK 7, ¶ 16, 85 P.3d 841. Similarly, where one corporation or limited-liability company is simply the instrumentality of another corporation or limited-liability company, the separation between the two may be disregarded and treated as one. *Id.* (citing *Frazier v. Bryan Memorial Hosp. Auth.*, 1989 OK 73, ¶ 16, 775 P.2d 281).

161.    A business association may become the "alter ego" of its shareholder or member where the business association (1) is undercapitalized, (2) is without separate books, (3) does not keep its finances separate from individual finances, such that individual obligations are paid by the business association or vice versa, or, (4) in the case of a corporation, does not follow corporate formalities, or, in the case of a limited-liability company, is merely a sham. *See Mattingly Law Firm, P.C. v. Henson*, 2020 OK CIV APP 19, ¶ 17 n.3, 466 P.3d 590 (modifying the alter ego analysis

applicable to corporations "to fit the LLC context," as "members often run LLCs in a very informal manner," making the corporate formalities factor "largely inapplicable to LLCs").

162. Weslaco is indebted to PharMerica in excess of $1.4 million. This debt was established during a binding arbitration and thereafter confirmed by this Court.

163. Weslaco is undercapitalized. Indeed, by its own concession in its fraudulently-filed Bankruptcy Action, Weslaco has only $80 in assets.

164. Weslaco and Fraudulent Transfer Defendants are without separate books in that their respective funds are comingled with one another. This is supported both by the (1) post-judgment discovery that PharMerica received from the Arbitrator, which, as detailed above, reveals that any funds Weslaco received were immediately transferred to other entities, and (2) the $10,000 check PHARMCAREUSA – GENERAL made out to Weslaco's bankruptcy lawyer, Mr. Allen, to file the Bankruptcy Action.

165. Weslaco does not keep its finances separate from individual finances. Indeed, Kent and Jalee—the Co-Trustees and Beneficiaries of the Abbott Family Trust, which is the sole member of Abbott Family, LLC, which is the sole member of Weslaco—personally transferred $50,000 to Weslaco to be used to partially satisfy

Weslaco's obligation to PharMerica. Upon information and belief, the same is true as to the Fraudulent Transfer Defendants.

166. Weslaco and the LLC Fraudulent Transfer Defendants are therefore mere shams and are the instrumentalities of one another. Therefore, their separate corporate existences can be disregarded.

167. For their part, the corporation Fraudulent Transfer Defendants do not follow corporate formalities; instead, they follow the whim of the Abbott Family as executed through the activities of the various Fraudulent Transfer Defendants. Therefore, their separate corporate existences can be disregarded.

168. To protect the rights of PharMerica and accomplish justice, it is necessary for this Court to disregard the limited liability company and/or corporate entity of Weslaco and Fraudulent Transfer Defendants and hold its member—Abbott Family, LLC—and Abbott Family, LLC's member—the Abbott Family Trust, of which Kent and Jalee are Co-Trustees and Beneficiaries—personally liable for Weslaco's obligations and/or corporate conduct under the legal doctrines of fraud, alter ego, and veil-piercing.

169. To protect the rights of PharMerica and accomplish justice, it is necessary for this Court to disregard the limited liability company and/or corporate entity of Weslaco and Fraudulent Transfer Defendants and hold their officers—Kent

(President and CEO), Jalee (Vice President, Treasurer, and Secretary), Cody ((Director), Mr. Nixon (General Counsel), and Mr. Propps (CFO)—personally liable for Weslaco's obligations and/or corporate conduct under the legal doctrines of fraud, alter ego, and veil-piercing.

170.    The separate existence of Weslaco and Fraudulent Transfer Defendants is and has been used by Abbott Family, LLC, Kent, Jalee, Cody, Mr. Nixon, and Mr. Propps as a design or scheme to perpetrate fraud as set forth above.

171.    Weslaco and Fraudulent Transfer Defendants are so organized and controlled and their affairs so conducted that they are mere instrumentalities or alter-egos of one another, Abbott Family, LLC, Kent, Jalee, Cody, Mr. Nixon, and Mr. Propps.

## COUNT V
### Tortious Interference with Contract
### (Against Kent, Jalee, Cody, Mr. Nixon, Mr. Propps, and Abbott Family, LLC)

172.    Except to the that extent they are inconsistent with the relief sought in this Count, PharMerica repeats and realleges the above allegations as if set forth here.

173.    There are three elements to a tortious interference with contract claim: (1) the defendant interfered with a contractual right of the plaintiff; (2) the interference was malicious and wrongful, and thus was not justified, privileged, or

excusable; and (3) the interference injured the plaintiff. *Daniels v. Union Baptist Ass'n*, 2001 OK 63, ¶ 13, 55 P.3d 1012.

174. It is undisputed that, under the TSA, PharMerica had a contractual right to receive from Weslaco "any payments received . . . with respect to" post-closing "claims" and Weslaco was contractually obliged to "immediately forward and remit" such payments to PharMerica.

175. Kent, Jalee, Cody, Mr. Nixon, Mr. Propps, and Abbott Family, LLC knew of PharMerica's contractual right and of Weslaco's contractual obligation.

176. Nonetheless, Kent, Jalee, Cody, Mr. Nixon, Mr. Propps, and Abbott Family, LLC interfered with PharMerica's contractual right. Specifically, these defendants caused Weslaco to immediately remit payments received with respect to post-closing claims to other Pharmcare entities, rather than PharMerica.

177. These defendants' interference with PharMerica's contractual right was malicious and wrongful, and thus was not justified, privileged, or excusable, as their sole basis for doing so was to interfere with PharMerica's benefit of the bargain in entering into the TSA with Weslaco. Moreover, these defendants personally benefitted from the tortious interference to PharMerica's detriment.

178. These defendants' interference with PharMerica's contractual right injured PharMerica in that it was underpaid by Weslaco hundreds of thousands of dollars as a direct result. In other words, absent these defendants' interference with PharMerica's contractual right, Weslaco could have immediately remitted post-closing payments to PharMerica as it was contractually obliged to do.

## COUNT VI
### *In the Alternative to Counts I and II,*
### Violations of the Uniform Fraudulent Transfer Act
### 24 OK Stat. § 112, *et seq.*
### <u>(Against Fraudulent Transfer Defendants, Abbott Family, LLC, Kent, and Jalee)</u>

179. Except to the that extent they are inconsistent with the relief sought in this Count, PharMerica repeats and realleges the above allegations as if set forth here.

180. Oklahoma has adopted the Uniform Fraudulent Transfer Act ("UFTA").

181. The UFTA prohibits fraudulent transfers. The "concept underlying fraudulent transfer is easily grasped. Where a person cannot reasonably expect to pay his debts in due course, that person's transfer of his assets to another person, without receiving equivalent value in return, can if done with bad motive be viewed as a dishonest trick that ought to be civilly undone and perhaps criminally punished." *In re Palladino*, 942 F.3d 55, 58 (1st Cir. 2019).

182. A "creditor" within the meaning of the UFTA is a person who has a "claim," defined broadly as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured." 24 OK Stat. § 113(3), (4).

183. PharMerica, as holder of a binding arbitration award and of a Final Judgment against Weslaco, has valid claims against Weslaco for its failure to immediately remit to PharMerica monies it was entitled to pursuant to contractual agreement. Weslaco admits these claims are unsatisfied and, via its bankruptcy petition, has admitted that PharMerica is a legitimate creditor.

184.   A transfer is fraudulent as to a creditor if a debtor makes it either (1) "with actual intent to hinder, delay, or defraud any creditor of the debtor;" or (2) "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 24 OK Stat. § 116(A).

185.   Additionally, a transfer is "fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred" if it was made "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 24 OK Stat. § 117(A).

186.   The UFTA permits a finding of intent to defraud where a transferee is in a position of dominance or control over a debtor's disposition of property or assets such that the transferee's intent to hinder, delay, or defraud creditors may be imputed to the debtor so as to render the transfer fraudulent.

187.   Between 2016 and 2018, Weslaco received millions of dollars in compensation from various healthcare benefit payors for pharmacy goods and services provided by it and PharMerica to Weslaco's patients.

188.   For example, between October 2016 and April 2018, Optum RX paid Weslaco $1,726,562.23 for pharmacy goods and services, most of which were provided

by PharMerica. Between October 2016 and September 2017, Caremark paid Weslaco $4,177,477.93 for pharmacy goods and services, most of which were provided by PharMerica. Between October 2016 and March 2017, Argus Health paid Weslaco $413,805.36 for pharmacy goods and services, most of which were provided by PharMerica. And between October 2016 and March 2017, Catamaran paid Weslaco $528,131.90 for pharmacy goods and services, most of which were provided by PharMerica. Weslaco also received significant sums from Medicare and other individual payors for post-closing services provided by PharMerica to Weslaco's patients.

189. Upon receipt of those funds, Weslaco immediately transferred the same to Fraudulent Transfer Defendants with actual intent to hinder, delay, or defraud PharMerica's collection of Weslaco's obligation under the TSA. *See* 24 OK Stat. § 116(A)(1). Such financial obligation was later memorialized in a final arbitration award and, after that, in a final judgment entered by this Court confirming the arbitration award.

190. Thereafter, upon information and belief, Fraudulent Transfer Defendants subsequently transferred the Weslaco funds to Kent, Jalee, and Abbott Family, LLC.

191. These transfers from Weslaco to the Fraudulent Transfer Defendants involved substantially all of Weslaco's assets and thus prompted Weslaco to report to PharMerica that its debt obligation could not be satisfied and to petition for Chapter 7 bankruptcy relief. *See* 24 OK Stat. § 116(B)(5).

192. These transfers were made while Weslaco was insolvent because the sum of Weslaco's debts exceeded their assets. *See* 24 OK Stat. §§ 114(B), 116(B)(9). Indeed, Weslaco's own schedules and matrixes filed in support of its bankruptcy petition reveal $80 in assets and more than $1,000,000 in debts (all owed to PharMerica).

193. Weslaco is also presumed to be insolvent in any event because it has not paid its debts in full as they have become due, namely, the moneys received for post-Closing prescription fills to be "immediately" remitted to PharMerica upon receipt. *See* 24 OK Stat. §§ 114(B), 116(B)(9).

194. Additionally, these transfers were made to insiders—affiliated Pharmcare-entities and subsequently to the members of those affiliated Pharmcare-entities. *See* 24 OK Stat. § 116(B)(1) (insider transfers indicate fraud), 9(B)(2) (fraudulent transfers may be avoided as to subsequent transferees). Fraudulent Transfer Defendants, Kent, Jalee, and Abbott Family, LLC were well aware of Weslaco's debt obligations and thus did not take the transfers from Weslaco in good faith.

195. Moreover, these transfers to Fraudulent Transfer Defendants were made without Weslaco receiving a reasonably equivalent value in exchange for the transfers and Weslaco intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. *See* 24 OK Stat. § 116(A)(2)(b). Specifically, Weslaco surrendered millions of dollars to Fraudulent Transfer Defendants, and thus to Kent, Jalee, and Abbott Family, LLC

and received *nothing* in return—again, its debt matrix in the bankruptcy proceeding it filed reflects $80 in assets. Moreover, Weslaco knew that it would incur remittance obligations under the TSA—which they admit they have underpaid—and that it would simply decline to pay PharMerica any of that admittedly underpaid money.

196.  As if that weren't enough, given Abbott Family, LLC's ownership of Weslaco and the Fraudulent Transfer Defendants, and the Abbott Family Trust's ownership of Abbott Family, LLC, Kent and Jalee in particular were in a position of dominance or control over Weslaco's disposition of assets such that Weslaco's intent to hinder, delay, or defraud PharMerica may be imputed to Kent, Jalee, and Abbott Family, LLC so as to render the transfer fraudulent within the meaning of the UFTA.

197.  Weslaco's transfers diminished the assets available to PharMerica—its only creditor. Weslaco admits this in its bankruptcy filings.

198.  For all the above reasons, Weslaco's transfers of millions in cash to Fraudulent Transfer Defendants constitute voidable, fraudulent transfers within the meaning of the UFTA.

199.  Because the initial transfers are voidable within the meaning of the UFTA, the Fraudulent Transfer Defendants' subsequent transfers to Abbott Family, LLC, Kent, and Jalee are similarly voidable, fraudulent transfers within the meaning of the UFTA. That is, Abbott Family, LLC, Kent, and Jalee are not good-faith transferees.

200.  In sum, for years, Fraudulent Transfer Defendants, Abbott Family, LLC, Kent, and Jalee have committed a series of "dishonest trick[s]" to avoid paying in full

Weslaco's indisputable obligations to PharMerica, all while enriching themselves. These tricks "ought to be civilly undone."

## PRAYER FOR RELIEF

PharMerica respectfully requests:

(a) Compensatory damages jointly and severally against the RICO Defendants in an amount sufficient to fully compensate PharMerica for the injuries sustained as a direct and proximate result of RICO Defendants' unlawful conduct, treble damages, costs, and reasonable attorneys' fees;

(b) The ill-gotten gains from RICO Defendants' unlawful scheme;

(c) Punitive damages against Defendants in an amount sufficient to deter the Defendants and others from engaging in this conduct in the future;

(d) The costs and attorneys' fees incurred by PharMerica in the preparation and prosecution of this action pursuant to 18 U.S.C. § 1964(c);

(e) Treble damages pursuant to 18 U.S.C. § 1964(c);

(f) In the alternative to RICO damages, authorization for PharMerica to avoid the fraudulent transfers from Weslaco to Fraudulent Transfer Defendants, and the subsequent transfers from Fraudulent Transfer Defendants to Abbott Family, LLC, Kent, and Jalee, and thus recover the transfers from those Defendants.

(g) Any and all other relief at law and in equity as justice may require;

(h) The Court direct that any judgment shall accrue pre-judgment and post-judgment interest at the statutory rate; and

(i) The Court grant PharMerica leave to amend this Complaint to assert any additional causes of action or to seek any additional remedies that may become available or which may be discovered during the course of this proceedings.

Respectfully submitted,

/s/ Anthony J. Jorgenson
Anthony J. Jorgenson, OBA #17047
JORGENSON PLLC
101 Park Ave., Suite 1300
Oklahoma City, OK 73102
Telephone: (405) 812-1431
Facsimile: (405) 553-2855
Email: anthony@jorgensonPLLC.com

- and -

/s/ Benjamin C. Fultz
Benjamin C. Fultz*
Robert E. Ranney*
FULTZ MADDOX DICKENS PLC
101 S. Fifth Street, 27th Floor
Louisville, Kentucky 40202-3116
Phone: (502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmdlegal.com
rranney@fmdlegal.com
*To seek admission

*Counsel for Petitioner,*
*Pharmacy Corporation of America*